COMMONWEALTH *vs.* PAUL KELLEY, JR.

No. 94-P-299.

Essex. September 8, 1995. - November 28, 1995.

Present: KASS, GILLERMAN, & IRELAND, JJ.

*Motor Vehicle*, Operating under the influence. *Evidence*, Breathalyzer test. *Practice, Criminal*, Discovery.

At the trial of a complaint for operating a motor vehicle while under the influence of alcohol, the judge properly allowed in evidence the defendant's breathalyzer test results, where the Commonwealth demonstrated sufficiently the "known value" of the simulator solution used to calibrate the defendant's test and that prescribed testing procedures had been followed: deviations, if any, from meticulous compliance with the procedures were properly submitted to the jury for consideration as to the weight to be accorded the breathalyzer test evidence. [451-453]

There was no reason, at a criminal trial, for the judge to exclude evidence of the defendant's breathalyzer test results by reason of the Commonwealth's alleged late production of a certification of analysis of the simulator solution used to calibrate the defendant's test, where the certificate, which was not introduced in evidence, was not exculpatory. [453-454]

COMPLAINT received and sworn to in the Salem Division of the District Court Department on September 28, 1988.

On transfer to the jury session of that division, pretrial motions were heard by *Robert E. Hayes*, J., and the case was tried before him.

*George Hassett* for the defendant.

*Margaret J. Perry*, Assistant District Attorney, for the Commonwealth.

KASS, J. While on his way home on September 28, 1988, from a charity banquet, the defendant Kelley drove errantly enough to attract the notice of a Wenham police officer, Brian H. Casparian, who pulled Kelley over. Officer Casparian administered three standard field sobriety tests — the

alphabet test, the walk heel-to-toe test, and the one-legged standing test. Kelley did not do well. There were other indicia of alcohol intoxication: slurred speech, uncertain gait, and the odor of drink. Kelley was arrested for operating a motor vehicle while under the influence of alcohol.

At the Wenham police station, Kelley submitted to breathalyzer tests and registered blood alcohol levels of .17 and .16,[1] well over the level, .10, at which an inference may be drawn that the person tested is under the influence of alcohol. G. L. c. 90, § 24(a) (*e*), as in effect prior to St. 1994, c. 25, §·5.[2] At trial in the District Court, Kelley mounted a protracted but unsuccessful campaign to exclude his breathalyzer test results from the evidence. His grounds for exclusion were: (1) that a police officer other than the one who administered the breath test entered the test results in the breath-test use log, a violation of 501 Code Mass. Regs. § 2.57 (1987); (2) that the breath-test operator failed to observe Kelley constantly for fifteen minutes immediately prior to administering the breathalyzer test, a violation of 501 Code Mass. Regs. § 2.55 (1987); and (3) that the Commonwealth should have, but did not, provide any certification demonstrating the known value of the calibrating solution (sometimes called the simulator solution) used in Kelley's test, a violation of 501 Code Mass. Regs. § 2.43 (1987). As an additional ground for exclusion of the breathalyzer test results, Kelley argued that the prosecution had failed to respond adequately to the defendant's discovery requests about the testing device and testing procedures.

A jury of six returned a verdict of guilty. On appeal, Kelley presses the grounds urged at trial for exclusion of the breathalyzer test results. We affirm the judgment of conviction.

Over the past three years, a series of court decisions has established some common ground underlying the technical

---

[1] The blood level numbers reflect the percentage, by weight, of alcohol in the blood of the person being tested.

[2] Since 1994, the blood alcohol level at which an inference of impairment is permissible has been .08.

requirements of breath testing for alcohol. Before the results of a breathalyzer test may be received in evidence, the prosecution must prove the existence of a periodic testing program for breath testing devices and compliance with that program. *Commonwealth* v. *Barbeau,* 411 Mass. 782, 786 (1992). The regulations formulated by the Secretary of Public Safety in response to *Barbeau,* in addition to providing for certification of breath testing devices at six-month intervals, delegated to police administering breath tests responsibility for testing the devices each time they were used. *Morris* v. *Commonwealth,* 412 Mass. 861, 863 (1992). See 501 Code Mass. Regs. § 2.41(1) (1992). In the *Morris* opinion, the court held that placing the task of periodic testing in the hands of police reasonably satisfied the legislative requirement for periodic testing contained in G. L. c. 90, § 24K. "The regulation recognizes that it is simply not possible for [the Office of Alcohol Testing (OAT)] representatives personally to conduct the mandated calibration standard analysis on each occasion on which a breathalyzer reading is taken in Massachusetts." *Morris* v. *Commonwealth,* 412 Mass. at 864-865. *Morris* also established that testing before each use met the legislative objective of "insur[ing] the accuracy of the breathalyzer readings." *Id.* at 866-867. In *Commonwealth* v. *Smith,* 35 Mass. App. Ct. 655, 661 (1993), the court accepted as conforming with G. L. c. 90, § 24K, testing procedures set out in an "Infrared Breath Test Operator's Manual" published by OAT and in circulation since 1987. OAT codified those procedures as regulations in the revisions of 501 Code Mass. Regs. § 2.41 published in 1992. Most recently, *Commonwealth* v. *Livers,* 420 Mass. 556, 559-560 (1995), reaffirmed that tests of devices in accordance with a program of periodic testing not yet enshrined in regulatory form satisfied the statutory requirement prior to the effective date (Feb., 1992) of 501 Code Mass. Regs. § 2.41 for the excellent reason that the statute does not require a set of regulations, as compared to a program, for periodic testing of breath alcohol devices.

1. *Proof of accuracy of simulator solution.* When administering a breathalyzer test, the prescribed procedure is to: (1) obtain a breath sample from the suspect which the device "reads" and records; (2) run a calibration standard analysis with a simulator solution; and (3) obtain a second breath sample from the subject to be read and recorded. 501 Code Mass. Regs. § 2.56(1) (1994).[3] The simulator solution, when run through the testing device, should produce a reading of .15. If it produces such a reading within a tolerance of .01 either way (i.e., a reading of .14 or .16), the machine is registering accurately and, therefore, the readings of the human subject's breath will be accurate. See *Commonwealth v. Cochran*, 25 Mass. App. Ct. 260, 261-263 (1988); 501 Code Mass. Regs. § 2.56(2) (1987).

The defendant's major point at trial and on appeal is that the "known value"[4] of the simulator solution had not been verified. There was evidence, however, that Lieutenant Lawrence Kavanagh of the Wenham police had picked up the simulator solution in question from the State police barracks. On the solution container was a label "Office of Alcohol Testing Simulator Solution." That batch of solution carried number 0472 and an expiration date of December 29, 1988. One week before the testing device was used on Kelley, Lieutenant Kavanagh ran five calibration tests with the solution, all of which registered .15. Written guidelines issued by OAT instructed operators of breath-test devices to replace simulator solution should they record three successive readings with it at .14.

Although the defendant purports to render mysterious the known value of the simulator solution, it follows from OAT's instructions and from the regulations in effect at the time that the standard assay of simulator solution distributed by

---

[3]The substance of the three-step testing appeared as well in the 1987 regulation in effect at the time Kelley was tested. See also *Commonwealth v. Cochran*, 25 Mass. App. Ct. 260, 261-262 (1988).

[4]Under 501 Code Mass. Regs. § 2.56(2) (1987), the calibration standard analysis (step two of the breath test) must "agree with the known value of the simulator solution to within +/-0.01 blood alcohol content units."

OAT was .15. Cf. *Commonwealth* v. *Neal*, 392 Mass. 1, 13 n.11 (1984). The defendant's position would require that OAT must certify the known value of the simulator solution every time a device is used to measure the alcohol content of a suspect's breath. Neither the statutes nor the regulations demand a level of testing that would call upon a representative of OAT to stamp a label of certification on an ampule of simulator solution any time that a breathalyzer test is run at any police station in the Commonwealth.

As to other elements of Kelley's breath test, the Commonwealth was diligent in offering evidence that the operator of the device had been trained and recertified as qualified on June 10, 1988, and that the device itself had been recertified by OAT within allowable time limits. Concerning the test itself, the Commonwealth offered testimony of Officer Karen Black about the manner in which she went about administering the test (it conformed with regulations) and about the test results themselves, including printouts of the testing of Kelley's two exhalations and the simulator solution. From the standpoint of adequacy of proof that the prescribed testing procedures had been followed, the evidence of Kelley's test results was rightly received.

Kelley raises two other grounds for excluding his breathalyzer test results. First, that Officer Black did not, as required by 501 Code Mass. Regs. § 2.55 (1987), keep him under observation for the requisite fifteen minutes, at a minimum, before having him blow into the machine[5]; and second, that Lieutenant Kavanagh, rather than Officer Black, entered the test results in the breath testing device maintenance and use log, in violation of 501 Code Mass. Regs. § 2.57 (1987), which requires the breath-test operator to enter the breathalyzer results in the maintenance and use log for the device. Both points are insubstantial. Officer Black testified that she observed Kelley for at least fifteen minutes and such

---

[5]The purpose of the waiting period under surveillance is to make sure any contaminants (e.g., tobacco smoke) in the test subject's mouth that might affect results have cleared and to be sure that the test subject is not burping or hiccoughing. 501 Code Mass. Regs. § 2.55 (1987).

conflict as there was in her testimony was whether the total period of observation was twenty or twenty-five minutes. Lieutenant Kavanagh was the officer in Wenham principally responsible for the breath testing device. That he in fact made the log entries rather than Officer Black, who administered the test to Kelley, does not go to the accuracy of the device or manner in which the test was performed, as to which there was independent evidence. Concerning Kelley, the printout from the machine of the two readings of his breath and of the simulator solution (which was within the allowable plus or minus .01 range) was more direct and reliable evidence than the log entries. As the trial judge correctly ruled, the defendant was free to argue that such deviations from meticulous compliance as there were in these two particular spheres should affect the weight the jury gave to the scientific evidence. See *Commonwealth* v. *Durning*, 406 Mass. 485, 489-490 (1990).

2. *Discovery compliance.* As an alternate to its unreliability theory, the defense urges exclusion of the breath test results as a sanction for failure by the Commonwealth to comply with a discovery order. See Mass.R.Crim.P. 14(a) and (c), 378 Mass. 874 and 880 (1979).

Ample evidence exists in the record to support the trial judge's conclusion that the Commonwealth complied with discovery requirements. Transcript of pretrial proceedings discloses extensive discussion of waiver by defense counsel of certain discovery requests and attempts by the Commonwealth to provide the defense with requested materials. The principal complaint of the defense is that the Commonwealth belatedly produced a certificate from the director of OAT certifying that simulator solution lot number 0472 (the one used in the defendant's test) was assayed to read 0.15%. For the reason that it did turn up late, the certificate, although marked for purposes of identification, was never placed in evidence. One might add that the certificate was the opposite of exculpatory, and if the defendant was denied anything, it was not of value to his defense. There was no occasion for

the judge to exercise his *discretionary* power to order the sanction of exclusion.

*Judgment affirmed.*